Commerce Photo-Print Corporation v. Commissioner.
Commerce Photo-Print Corp. v. Commissioner
Docket No. 6023.
United States Tax Court
1947 Tax Ct. Memo LEXIS 251; 6 T.C.M. (CCH) 386; T.C.M. (RIA) 47090; April 11, 1947
*251 Compensation. - On the evidence, held, that a portion of extra compensation paid to petitioner's principal stockholders-directors-officers is deductible as reasonable compensation for extra services rendered, and held, further, that the remainder of such extra compensation is unreasonable and excessive. Excess profits tax. - Held, that a certain legal fee paid in 1940 was not an ordinary and necessary business expense deductible in computing the amount of petitioner's net loss for that year and, accordingly, should not be reflected in the computation of petitioner's unused excess profits credit carry-over for 1942 for the purpose of computing petitioner's excess profits tax for 1942. Charles A. Roberts, Esq., 165 Broadway, New York 6, N. Y. for the petitioner. J. Frost Walker, Jr., Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion TYSON, Judge: The respondent has determined deficiencies in the amounts of $38.61 income tax, $215.79 declared value excess-profits tax, and $12,271.50 excess profits tax for the calendar year 1942, or a total of $12,525.90, substantially all of which is in controversy. The petitioner assigns error in respondent's *252 disallowance of $14,000 of the total amount of $51,300 claimed as a deduction for compensation of officers for 1942. The respondent, by amended answer filed prior to the hearing, makes claim for an increase of $1,190 in the asserted deficiency in excess profits tax. In support thereof he affirmatively alleges that the amount of the unused excess profits credit carry-over from 1940 and 1941 and allowed petitioner for 1942 should now be reduced by the elimination of $1,575 representing legal fees which constituted a capital expenditure in 1940 and thus were not allowable as a part of petitioner's operating net loss for that year. Petitioner denies that any portion of the amount deducted by it for legal fees in 1940 represented an expenditure in connection with a capital transaction. Findings of Fact The petitioner is a New York corporation with its principal office at 1 Wall Street, New York City. Petitioner's return for the year involved was filed with the collector for the second district of New York, Custom House, New York City. The petitioner's books have always been kept and its returns for all years, including 1942, have been prepared and filed, on the accrual method of accounting. *253 The petitioner was organized in 1924 with 200 shares of common capital stock and an original investment of about $3,000 in its commercial photostat business. From 1924 until September 27, 1940, William Cheyney owned 102 shares, or 51 per cent, of petitioner's stock and was its president, and Raymond H. Lutz owned 98 shares, or 49 per cent, of petitioner's stock and was its secretary-treasurer. Until Lutz served his connection with petitioner on September 27, 1940 he and Cheyney were its only executive officers and they directed its business, and subsequent to that date Cheyney controlled and directed petitioner's business during the years material here. The character of petitioner's business requires that it secure and retain the confidence of its customers because at least 95 per cent of the papers delivered for photostating are confidential and valuable and, also, the business requires close supervision over employees by the executives in order to keep track of all papers while being processed so as to avoid loss of originals and to insure the proper return of each customer's papers. The petitioner had some regular customers, but the character of its business is such that it *254 did not have a back-log of orders and operated more or less on a basis of day to day orders which necessitated an allowance of from 25 per cent to 50 per cent idle time in its reproduction shops. Through the years the volume of petitioner's business continuously expanded until some time prior to and during 1942 it was one of the largest commercial producers of photo prints, serving the public, in New York City and operated five fully equipped and staffed photostat establishments in that city. The petitioner experimented with and was instrumental in the introduction into general use of a thin photostat paper which could be folded without cracking. In the latter part of 1939 petitioner acquired all of the capital stock of the Mathias & Carr Corporation which had been a competitor, and thereafter operated it as a subsidiary, for low priced business, principally under the supervision of Lutz who gave more of his time to the affairs of that company than to those of petitioner. During the years 1935 to 1940 Cheyney and Lutz had marked differences of opinion over petitioner's price policies, the former desiring to maintain fair standard prices to all customers while Lutz, contrary to *255 Cheyney's instructions, followed a practice of giving cut-rate prices to prospective customers in order to secure new business and increase the volume of prints. Such practices kept petitioner's prices in a constant state of flux and resulted in losses. During the middle of 1940 Cheyney concluded that he and Lutz could no longer do business together and negotiations were begun for the petitioner's acquisition of its shares of stock owned by Lutz. In the summer of 1940 Cheyney told two of petitioner's employees, Monroe Webster and Louis E. Woodring, that if they would remain with the organization after Lutz left they would be made officers of petitioner, would be given an opportunity to buy stock in petitioner, and that if the business showed profits they would be compensated accordingly. Webster had been employed by petitioner since about 1925; he had made a study of the photostat business including the actual operation of the machines and equipment; he had taken special courses at Eastman Kodak in Rochester, New York; and, also, he had acquired a practical knowledge of accounting under the direction of Cheyney who was an accountant. During 1939 and up to October 1940, Webster was *256 an all-around man, engaged in both sales and production work for petitioner and was the general manager of three or four of petitioner's photostat establishments, but he took no part in formulating the petitioner's business policies. Woodring had been employed by petitioner sometime prior to 1937 and during 1939 and up to October 1940 he was the assistant treasurer of petitioner. The basic salaries paid by petitioner to Webster and Woodring, respectively, from 1937 up to September 30, 1940, inclusive, were as follows: 1937
1938
1939
1940 (to Sept. 30)
Webster
$2,994.86
$2,890.20
$3,420.00
$2,938.52 *
Woodring
2,112.22
2,369.30
2,924.50
2,546.89 *
On September 27, 1940, as a result of the negotiations begun in the middle of 1940, petitioner acquired all of the 98 shares, or 49 per cent, of its capital stock then owned by Lutz for a consideration having a total value of $12,368.28, paid chiefly by an exchange of all of the capital stock of petitioner's then wholly-owned subsidiary, Mathias & Carr, and, in addition, certain *257 equipment and cash. The parties also agreed not to infringe upon each other's list of 100 protected customer accounts. On the same date, Lutz resigned as secretary-treasurer and as a director of the petitioner. On September 27, 1940, the petitioner's board of directors, consisting of Cheyney and W. Hampton Warde (petitioner's attorney), adopted resolutions whereby: Lutz' resignation as secretary-treasurer and a director of the company was accepted; Webster was elected a director of the company and also elected its secretary at a salary of $5,000 per year beginning October 1, 1940; Woodring was elected treasurer of the company at a salary of $4,500 per year beginning October 1, 1940; Cheyney, Webster, and Woodring were each voted a $1,500 bonus to be paid on October 1, 1940 for "extra and special services" rendered to the company by each of them "from January 1, 1940 to October 1, 1940"; Warde was voted an annual retainer of $500 commencing October 1, 1940 and payable quarterly to "cover his services as a Director and as General Counsel, but not to include special services"; and, further, it was resolved that 60 shares of the petitioner's "treasury stock at $146.615 per share, be *258 offered for sale" as follows, 10 shares to Webster, 10 shares to Woodring, and 40 shares to Cheyney. The abovementioned bonuses were voted because of the extra services rendered petitioner during the period January 1 to October 1, 1940 by Cheyney, Webster, and Woodring in holding many late conferences with respect to the handling of petitioner's business in view of the expected changes in the officers and general business policies of petitioner and, also, in performing various duties in addition to the usual sales and production work. On October 1, 1940, Webster and Woodring assumed the duties of secretary and treasurer, respectively, and also, each assumed some of the administrative duties theretofore performed by Lutz, and Cheyney assumed complete control over the management of petitioner's business policies, including the managerial duties theretofore performed by Lutz. Standard prices were set by Cheyney, based on cost of production, so that all sales of prints would show a profit. Also, Cheyney undertook to reallocate or apportion Lutz's former salary between himself, Webster, and Woodring so that those three executives would be compensated for the additional duties assumed *259 by each of them. On January 20, 1941, a majority of the petitioner's board of directors, comprised of Cheyney, Webster, and Woodring, adopted resolutions whereby, inter alia, Cheyney was elected president at a yearly salary of $13,000; Webster was elected secretary, at a yearly salary of $5,000, and Woodring was elected treasurer, at yearly salary of $4,500. At a special meeting on May 2, 1941, a majority of the petitioner's board of directors, comprised of Cheyney, Webster, and Woodring, adopted resolutions authorizing, inter alia, payment of bonuses for additional services up to and including April 30, 1941, in various amounts totalling $625 to 27 employees and $500 to each Cheyney, Webster, and Woodring; and further authorizing the payment of officers' yearly salaries beginning May 1, 1941 in the amounts of $15,000 for Cheyney, $7,000 for Webster, and $6,500 for Woodring. At a special meeting on July 2, 1941, a majority of the petitioner's board of directors, comprised of Cheyney, Webster, and Woodring, considered the treasurer's report showing that the total of those three officers' basic salaries for the six months ended June 30, 1941 was $2,890.04 below the total basic *260 salaries paid Cheyney, Lutz, Webster, and Woodring during the corresponding period of 1940, and adopted resolutions, inter alia, directing an increase in the weekly wages of certain employees, and further directing that the salary of the president, secretary, and treasurer, respectively, for the six months period ended June 30, 1941 be adjusted by payment of $963.35 to each as of that date. At a special meeting on September 30, 1941, a majority of the petitioner's board of directors, comprised of Cheyney, Webster, and Woodring, adopted resolutions, inter alia, directing an increase in the weekly wages of certain employees; the payment of bonuses in various amounts totalling $625 to 11 employees for additional services rendered up to September 30, 1941; and further directing that the salary of the president, secretary, and treasurer, respectively, for the nine months period ended September 30, 1941 be adjusted by payment of $400 to each so that the total executive basic salaries for that period would correspond to the total of such basic salaries including that of Lutz authorized for the similar period in 1940. At a special meeting on November 14, 1941, a majority of the petitioner's *261 board of directors, comprised of Cheyney, Webster, and Woodring, adopted resolutions, inter alia, directing: an increase in the weekly and/or hourly wages of certain employees; the payment on December 19, 1941 of additional bonuses in various amounts totalling $1,205 to 36 employees; the payment on December 31, 1941 of a bonus (equivalent to 10 per cent of salaries paid during the current year 1941) of $1,109.33 each to Cheyney, Webster, and Woodring; and further directing that the basic salary of the president, secretary, and treasurer, respectively, be finally adjusted for the current year 1941 by payment of $396.66 to each of them so that the total executive basic salaries for 1941 would correspond to the total amounts of authorized basic executive salaries immediately prior to the resignation of R. H. Lutz on September 27, 1940. On January 19, 1942, a majority of the petitioner's board of directors, comprised of Cheyney, Webster, and Woodring, adopted resolutions, inter alia, whereby: Cheyney was elected president at an annual salary of $16,600; Webster was elected secretary at an annual salary of $8,600; and Woodring was elected treasurer at an annual salary of $8,100. Also, *262 at that meeting, a resolution was adopted to pay W. Hampton Warde an annual retainer of $500 for 1942 as a director and general counsel. The minutes of a special meeting held on July 1, 1942 of petitioner's board of directors, including Cheyney, Webster, Woodring, and Mrs. Cora E. Cheyney, are, in part, as follows: The President submitted a report prepared by the Treasurer, comparing the business of this Corporation for the first six months of 1942 with its business for the corresponding period of 1941, and directed that a copy of said report be appended to these minutes. The Treasurer called attention to the fact shown in the report that production thus far in 1942 has been slightly more than double the production for the corresponding period in 1941 as measured by the amount of paper used in the two periods, but the dollar amount of sales does not reflect the entire increase in activity in 1942 because the average price charged per print has been substantially lower in 1942 than in 1941, notwithstanding a sharp rise in the cost of materials and labor. The Vice-President also called attention to the additional supervisory burden which had been created by the continual turnover *263 of personnel and loss of trained employees. In view of the added responsibilities and efforts required on the part of the executive officers the President recommended that a corresponding adjustment be made in their compensation. Accordingly on motion made, seconded and carried, it was Resolved that in addition to their regular salaries, $6,000 extra compensation be paid to each of the following officers for their services rendered and to be rendered in 1942, i.e., to William N. Cheyney, President, to C. Monroe Webster, Vice-President and Secretary, and Louis E. Woodring, Treasurer; $4,000 to be credited to each of said officers as of June 30 and the remaining $2,000 to be credited as of September 30, and payment thereof to be made from time to time prior to December 31, 1942, as the current financial position of the corporation may in the opinion of the President be conservatively deemed to permit. The total amounts accrued and actually paid by petitioner to Lutz prior to his retirement and to Cheyney, Webster, and Woodring during the years 1938 to 1942, inclusive, as compensation including basic salaries, adjusted salaries, and bonuses, were as follows: 1938
1939
1940
1941
1942
Cheyney
$13,000
$14,000
$14,500
$17,702
$22,660
Lutz
13,000
14,000
7,691
Webster
2,890
3,420
5,501
9,703
14,600
Woodring
2,369
2,924
4,985
9,203
14,100
$31,259
$34,344
$32,677
$36,608
$51,300
*264 The basic officers' salaries as authorized on January 20 and May 2, 1941 and the three additional adjustments thereto on July 2, September 30, and November 14, 1941, were made so that the total basic salaries paid for that year to Cheyney, Webster, and Woodring would correspond to the total amount of authorized salaries for Lutz and those three men as of September 27, 1940, because the three men had taken over Lutz' duties in the operation of petitioner's business. The 1941 bonus of $1,109.33 to each of the three officers, and the increased basic officers' salaries authorized on January 19, 1942 for that year, were given primarily in recognition of the increase in petitioner's volume of business and profits therefrom, but also to some extent because of the added responsibilities and administrative work of the officers which resulted from the increased volume and labor turn-over. The petitioner's net sales, its per cent of increase over the previous year, and its net income, as per its books for the years 1938 to 1942, inclusive, were as follows: % Increase Over
Year
Net Sales
Previous Year
Net Income
1938
$113,760
($ 293) *
1939
127,533
12.1%
1,722
1940
115,584
( 9.4%) **
( 10,374) *
1941
150,857
30.5%
10,860
1942
230,844
53.0%
16,776
*265 The net loss for 1940 was attributable to a decline in sales, to Lutz' policy of cutting prices, and to a loss on certain experimental equipment. In 1938 the petitioner obtained its first photostat work for some United States Government Agencies in the New York City area. In 1941 the petitioner proposed, and the United States Government adopted, the idea of letting contracts to one concern for all the photostat work of various Government agencies in the vicinity of New York City. The petitioner was underbid on the contracts ending June 30, 1941. The petitioner did obtain the Government contracts for the years commencing July 1, 1941 and July 1, 1942 and its bid prices were figured on a slim margin of profit, so that while its volume of photostat prints produced during 1942 was 76 per cent greater than in 1941, its dollar net sales for 1942 amounted to 53 per cent increase over 1941. In the petitioner's business the cost of sensitized photostat paper is the largest item of expense and wages constitute the next largest item. During 1942, while petitioner's dollar sales to Government agencies amounted to only 29 per cent of its total sales *266 during that year, because of the low bid price for such work compared with the standard prices for other customers the cost of goods sold to those two classes of customers was approximately the same, that is, 50 per cent of all the paper consumed by petitioner and 50 per cent of the use of its equipment, chemicals, and its employees' time were used in petitioner's production of photostats for Government agencies and the remaining 50 per cent of such items was used in petitioner's production of photostats for its other customers. The increased volume of production of photostat print for both Government agencies and commercial concerns during 1942 placed an added responsibility on petitioner's three executive-officers apart from their routine duties, and such added responsibilities resulted in longer working hours for them during 1942 than in any prior year. During 1942 the petitioner experienced a large turnover in employees including skilled machine operators and that condition made it necessary for the petitioner to conduct an evening apprentice school to train new employees for a period of four months to one year, which required extra time and attention of petitioner's executive *267 officers. During 1942 Cheyney was president and he exercised direct control over petitioner's business policies, set the standard prices, figured the bid prices for contracts, and exercised general control over the operations; Webster was vice-president and secretary and was in charge of petitioner's sales and production, purchased production materials, and directed all advertising; and Woodring was treasurer and was in charge of petitioner's financial matters, books, records, and tax reports and was also in charge of personnel matters. Each of the three officers devoted all of his time to petitioner's business, except that Cheyney spent four months of the year in Florida and while there he received daily and weekly statements and semi-monthly profit and loss statements and he was in constant touch with petitioner by telephone in maintaining his control over petitioner's business. During 1942 the petitioner's 200 outstanding shares of stock were owned as follows: Cheyney, 145 shares; his wife, Cora E. Cheyney, 25 shares; Webster, 15 shares; and Woodring, 15 shares. The petitioner paid no dividends on its shares of capital stock during any of the years 1939 to 1942, inclusive. *268 The annual salaries for 1942 of $16,600 for Cheyney, $8,600 for Webster, and $8,100 for Woodring were voted on January 19, 1942 by those three men who were the petitioner's principal stockholders-directors-officers, and those salaries were based on the then contemplated services to be rendered by each of them during 1942 in connection with the petitioner's then known volume of business and profits. The extra compensation of $6,000 authorized for each of those three officers for 1942 was voted on July 1, 1942 by themselves and Cheyney's wife and were based on the treasurer's report that sales for the first six months of 1942 had increased 69 per cent over sales for the same period of 1941 and, also, on the expected increased profits for the year as well as the additional time, effort, and responsibility required of those officers because of the material increase in the volume of business. The payment of such extra compensation was to be made as petitioner's current financial position would conservatively permit, in the opinion of Cheyney. Such extra compensation for 1942 was reasonable to the extent of $2,000 each for Cheyney, Webster, and Woodring and constituted unreasonable compensation *269 to each in the amount of $4,000. In determining the deficiencies involved herein, the respondent disallowed the following portions of the above-mentioned extra compensation for 1942: as to Cheyney, $6,000; as to Webster, $4,000; and as to Woodring, $4,000. During 1940 petitioner employed W. Hampton Warde as its attorney to handle the negotiations and legal details of the hereinbefore described transaction whereby, on September 27, 1940, primarily in exchange for all the stock of its subsidiary, Mathias & Carr, the petitioner acquired from Lutz 98 shares, or 49 per cent, of its own capital stock, which shares were entered on petitioner's books as treasury stock and held for subsequent sale to its officers. In connection with that transaction petitioner secured the withdrawal of Lutz from participation in its business as a stockholder, director, and officer thereof. Warde attended many conferences at which the basis and terms of the transaction were discussed and as a result of which the exchange was consummated. Also, he attended conferences involving the advisability of increasing the number of petitioner's directors, he had conferences at the office of the Secretary of State of *270 New York, and he prepared and secured an amendment to petitioner's charter increasing the number of its directors. For the abovementioned services during 1940 Warde submitted to petitioner his bill entitled, "TO SERVICES in reorganization of Company" in the amount of $1,575, and the petitioner paid such bill in full. Entirely apart from the above-mentioned services the petitioner retained Warde as general counsel commencing October 1, 1940, at an annual retainer of $500, and, on or about that date, paid him $125 as a general retainer for routine legal matters and consultations for the months of October, November, and December 1940. During 1940 the petitioner employed no attorney other than Warde. The fee in the amount of $1,575 paid by petitioner to Warde for his services in 1940 constituted an expenditure primarily in connection with petitioner's acquisition in that year of 49 per cent of its outstanding capital stock and the resultant withdrawal of Lutz from any participation in the petitioner's business as a stockholder, director, or officer, and did not constitute an ordinary and necessary business expense of 1940. On its 1940 income tax return, the petitioner deducted, under *271 Schedule K, as a legal expense, the amount of $1,700 comprised of the legal fees of $125 and $1,575 paid to Warde for services as described in the next preceding paragraph, and such deduction was reflected in petitioner's reported net loss of $10,374.46 and thus no adjusted excess-profits net income for that year. The net loss of $10,374.46 for 1940 was carried forward as a "net operating loss deduction" under item 26 on its income tax return for 1941 which disclosed a normal tax net income of $485.83. The petitioner's excessprofits tax return for 1941 disclosed no adjusted excess-profits net income subject to tax after application of an excess-profits credit carry-over. The petitioner's 1942 excess profits tax return disclosed an adjusted excess profits net income of $7,603.86 after allowances for specific exemption, excess-profits credit based on invested capital, and "Unused excess-profits credit adjustment" or carry-over in the amount of $2,316.75 in the computation of which the 1940 net loss of $10,374.46 is taken into account in arriving at petitioner's equity invested capital. In determining the deficiency involved herein in excess-profits tax for the year 1942 the respondent *272 has determined the "Unused excess-profits credit adjustment for 1942" to be in the amount of $2,372.89 in the computation of which he has likewise taken into account such 1940 net loss of $10,374.46. Opinion The first issue is one of fact, and we have found that extra compensation for 1942 in the amount of $2,000 for each of petitioner's three executive officers was reasonable. In so finding we have, in effect, sustained the respondent's determination as to what constituted reasonable additional compensation for Webster and Woodring and modified his determination to the extent that he failed to allow a deduction of $2,000 as reasonable additional compensation for Cheyney who exercised direct and active control over petitioner's business policies and its operations. All the circumstances herein warrant the allowance of such additional compensation, for the annual salaries voted the three executive officers on January 19, 1942 were based on the then contemplated services to be rendered during 1942 and respondent raises no question as to the reasonableness thereof, the only question as to the reasonableness of compensation raised by respondent relating to the $6,000 extra compensation *273 provided for in the resolution of July 1, 1942; and, further, the extra compensation of $2,000 each is justified by the additional services required of and responsibilities imposed upon each of those officers due to the material increase in petitioner's volume of business in 1942. The remaining $4,000 extra compensation authorized by the resolution of July 1, 1942 for each of the three officers for 1942 is not justified by the facts and circumstances herein. Such amount voted by petitioner's principal stockholders-directors-officers appears to have been based primarily on the expected increase in petitioner's profits for the year 1942, rather than being warranted by the amount of additional services rendered in that year. We conclude that the total amount of $12,000 should be disallowed as a deduction for 1942, because it constitutes unreasonable and excessive compensation to petitioner's three principal stockholders-directors-officers. Cf. (promulgated January 31, 1947). The second issue resolves itself into a question of whether the amount of $1,575 legal fee paid by petitioner to Warde in 1940 constituted a capital expenditure, *274 as affirmatively pleaded by respondent, or constituted a deductible ordinary and necessary business expense. On brief, the petitioner concedes that if such fee was a capital expenditure then the amount thereof is not deductible in computing petitioner's operating net loss for 1940 and, accordingly, should not be reflected in the computation of petitioner's unused excess-profits credit judgment for 1942 in determining its excess profits taxes for that year. However, petitioner contends that the legal fee of $1,575 paid Warde was primarily incurred for the adjustment of personnel relations within the corporation, namely, the withdrawal of Lutz as secretary-treasurer whose price cutting policies resulted in losses for petitioner; that petitioner's acquisition of 98 shares of its own capital stock was merely incidental to such primary purpose; and further that in any event no proper division of the fee can be made as between services rendered in connection with Lutz's withdrawal and the acquisition of stock. In our opinion, no division of a fee can or should be made, for it was paid for services in connection with the entire transaction which, as ultimately consummated, resulted in: *275 the petitioner's acquisition of 49 per cent of its own shares of stock (to be held as treasury stock for subsequent disposition) in exchange for the stock of its subsidiary corporation, plus certain equipment and cash; the amendment of petitioner's charter as to the number of directors; and as a necessary incident to petitioner's acquisition of its own shares of stock, the elimination of Lutz as a stockholder, director, and officer of petitioner. We think it immaterial that Cheyney, the majority stockholder, desired to eliminate Lutz from participation in petitioner's business. It is clear that the portion of the $1,575 fee which was paid in connection with petitioner's acquisition of 49 per cent of its own shares of stock in exchange for the stock of its subsidiary corporation was an expenditure for the acquisition of property; and, therefore, a capital expenditure rather than a business expense. It is also clear that, under the principle applied in ; ; and , the other portion of the $1,575 paid in connection with the amendment *276 to petitioner's charter was not a business expense. Accordingly, we hold that no portion of the fee of $1,575 is deductible in computing petitioner's net loss for the year 1940. In view of the above conclusion and petitioner's concession that if the $1,575 fee is not deductible as a business expense in 1940 it may not be reflected in the computation of its unused excess-profits credit adjustment or carry-over for 1942 the respondent is sustained on this issue. Decision will be entered under Rule 50. Footnotes
*. Exclusive of a bonus of $1,500 paid on October 1, 1940 for services rendered from January 1 to October 1, 1940.↩
*. Net loss. ↩
**. Decrease in sales.↩